**E-FILED on**   8/13/10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MOBASSA BOYD,<br><br>        Petitioner,<br><br>    v.<br><br>ANTHONY NEWLAND,<br><br>        Respondent. | No. C-00-21287 RMW<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY<br><br>**[Re Docket No. 51]** |

Petitioner Mobassa Boyd petitions for a writ of habeas corpus under 28 U.S.C. § 2254. This court previously denied the petition. On appeal, the Ninth Circuit remanded with instructions: (1) to grant a conditional writ of habeas corpus ordering petitioner's release unless the state provides him a complete voir dire transcript without charge and (2) to allow petitioner to renew his claim that the prosecution's peremptory strike of an African-American juror violated his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986). After receiving the complete voir dire transcript free of charge, petitioner filed a renewed *Batson* claim on May 30, 2008. The court has reviewed the merits of petitioner's renewed claim in light of the full voir dire transcript, and for the reasons set forth below, the petition for writ of habeas corpus is denied.

# I. BACKGROUND

### A. Factual Background

On the morning of February 5, 1998, petitioner visited his grandmother, Lilla Downs. Petitioner informed Downs he had a gun in his backpack and offered to show it to her. He also told her there was a warrant out for his arrest, and he would not be taken alive. Downs, frightened by her grandson's comments, called the police. Officers arrived and took petitioner into custody. A search revealed shotgun shells in petitioner's backpack and an unloaded sawed-off shotgun underneath a bed. Petitioner was charged with unlawful possession of a firearm, having previously suffered a juvenile adjudication for a felony (Cal. Penal Code § 12021(e)), and unlawful possession of a sawed-off shotgun (Cal. Penal Code § 12020(a)).

During jury voir dire, the prosecutor exercised a peremptory challenge against prospective juror Shirley Brown, an African-American woman.[1] Petitioner's trial counsel moved to dismiss the entire jury panel on a *Wheeler/Batson*[2] theory, arguing that the prosecutor's peremptory challenge was racially motivated. The trial court denied petitioner's motion on the ground that there was no prima facie showing that the prosecutor struck the prospective juror based on her race. *See* Cal. Ct. App. Op. at 3.

Petitioner waived his right to have a jury determine the truth of his prior juvenile adjudication. In a bench trial, the trial court found that petitioner had suffered a prior juvenile adjudication for attempted murder, a serious felony within the meaning of California Penal Code Sections 667(e)(1) and 1170.12(c)(1). On June 2, 1998, the jury convicted petitioner of unlawful possession of a firearm, having previously suffered a juvenile adjudication for a felony, and unlawful possession of a sawed-off shotgun. On June 30, 1998, the trial court sentenced petitioner to six years in prison.

---

[1]   Petitioner is African-American.

[2]   *People v. Wheeler*, 22 Cal. 3d 258 (1978); *Batson v. Kentucky*, 476 U.S. 79 (1986).

### B.     Procedural Background

On April 12, 1999, petitioner challenged his conviction on direct appeal. During the pendency of the direct appeal, petitioner filed three separate requests to supplement the record to include the entire jury voir dire transcript, which petitioner maintained was necessary to fully present his *Wheeler/Batson* argument. The California Court of Appeal granted the request in part, requiring that petitioner be provided the voir dire of prospective juror Ms. Brown and his counsel's argument under *Batson*. However, the court of appeal denied petitioner's request for a complete jury voir dire transcript, finding that he had failed to "establish with some certainty how the requested materials may be useful on appeal," as required by a California local rule. Cal. Ct. App., First App. Dist. Local Rule 6(d) (2003). The California Court of Appeal affirmed petitioner's underlying conviction, and the California Supreme Court denied his petition for review without comment.

From February 2000 to August 2000, petitioner filed habeas petitions in California's Superior Court, Court of Appeal, and Supreme Court. Each state habeas petition was denied. Petitioner filed a habeas petition with this court on December 27, 2000, asserting in part that: (1) the prosecution's peremptory strike of an African-American juror violated his rights under *Batson*, and (2) the state court's refusal to provide petitioner a complete voir dire transcript free of charge violated his rights to due process, equal protection, and effective assistance of counsel. This court denied the petition on August 8, 2003, finding that: (1) petitioner had failed to make a prima facie showing of discrimination; (2) *Batson* did not require courts to conduct comparative juror analysis; and thus (3) failure to provide petitioner with a free, complete transcript of the jury voir dire did not violate clearly established federal law.

Petitioner appealed this court's decision to the Ninth Circuit. The first panel opinion by the Ninth Circuit upheld this court's ruling. *See Boyd v. Newland*, 393 F.3d 1008, 1010 (9th Cir. 2004). However, in light of two Supreme Court cases clarifying *Batson* that issued shortly after the first Ninth Circuit opinion – *Johnson v. California*, 545 U.S. 162 (2005) and *Miller-El v. Dretke*, 545 U.S. 231 (2005), the Ninth Circuit panel reconsidered its earlier opinion and concluded that a complete voir dire transcript was necessary to determine whether the circumstances surrounding the contested strike sufficed to establish a prima facie showing of discrimination. The Ninth Circuit

thus issued an amended opinion in June 2006, reversing and remanding in part, with instructions to grant the petition for habeas corpus with respect to the *Batson* claim. *See Boyd v. Newland*, 455 F.3d 897, 910 (9th Cir. 2006). In October 2006, the Ninth Circuit again amended its opinion, instructing this court to enter a conditional writ of habeas corpus ordering petitioner's release unless the state provides petitioner a complete voir dire transcript without charge and permitting petitioner to renew his *Batson* claim in this court. *See Boyd v. Newland*, 467 F.3d 1139, 1152 (9th Cir. 2006). The Ninth Circuit made clear that, in considering petitioner's *Batson* claim, this court should perform comparative juror analysis in order to fully evaluate the relevant circumstances surrounding the contested peremptory challenge. *See id.* at 1150-51.

After the Supreme Court denied review, and the Ninth Circuit issued its mandate, the state provided petitioner with a complete voir dire transcript free of charge. On May 30, 2008, petitioner filed a renewed *Batson* claim.

## II. ANALYSIS

### A.    Expansion of the Record

Petitioner seeks to expand the record to include handwritten notes by petitioner's trial counsel of the voir dire. *See* Dkt. No. 52 Ex. 2. It is undisputed that these notes are necessary to establish the race of the prospective and actual jurors for the purpose of comparative juror analysis. Respondent objects to the admission of these notes, arguing that: (1) they are inadmissible hearsay, and (2) they are barred under 28 U.S.C. § 2254(e)(2).

Rule 7 of the Federal Rules Governing Section 2254 Cases permits district courts to expand the record in habeas cases without holding an evidentiary hearing. However, "[t]he Supreme Court recently made clear in *Holland v. Jackson*, [542 U.S. 649 (2004),] that the conditions of § 2254(e)(2) generally apply to Petitioners seeking relief based on new evidence, even when they do not seek an evidentiary hearing." *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005). Consequently, petitioner must comply with the requirements of 28 U.S.C. § 2254(e)(2) in order to add new evidence to the record, even if he does not seek an evidentiary hearing. *See id.*

28 U.S.C. § 2254 (e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Accordingly, the court first considers whether petitioner "failed to develop the factual basis" of his *Batson* claim in the state court proceedings. Lack of diligence or otherwise being at fault for the deficiency in the state court record constitutes failure to develop the factual basis of a claim under Section 2254(e)(2). *Williams v. Taylor*, 529 U.S. 420, 433-34 (2000).

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.

*Id.* at 437 (internal quotations omitted).

While proceeding before the California Court of Appeal, petitioner made multiple requests to supplement the record with the complete voir dire transcript and thus was undoubtedly diligent in this respect. However, he failed to diligently develop the evidentiary record regarding the race of the prospective and actual jurors – facts that were readily available to him and undoubtedly relevant to his *Batson* claim. Petitioner argues that he failed to develop the record in this manner because comparative juror analysis was not permitted under California law at the time, rendering such facts irrelevant. If petitioner's claim were based on a new constitutional right that did not exist at the time of the state court proceedings, failure to develop the record with the facts necessary to support his newly available claim would not be his fault. However, the Ninth Circuit held that "*Johnson* and *Miller-El* merely clarify *Batson* and do not establish new rules of criminal procedure." *Boyd*, 467

F.3d at 1146. Consequently, the Ninth Circuit concluded that the California appellate courts had violated clearly established federal law, i.e. federal law that had already been well-established at the time of the state court proceedings, by failing to conduct comparative juror analysis. *Id.* at 1151. Thus, to the extent petitioner's *Batson* claim relies upon comparative juror analysis, it is based on constitutional law that was well-established at the time of the state court proceedings. Moreover, even without comparative juror analysis, the race of the prospective and actual jurors is relevant for statistical analysis to determine whether discriminatory purpose can be inferred. It is petitioner's duty to develop the evidentiary record with the facts that are reasonably available to him and necessary to support his claim. His failure to do so precludes him from expanding the record before the district court unless he is able to satisfy the strict requirements of 28 U.S.C. § 2254(e)(2). *See Cooper-Smith*, 397 F.3d at 1241.

It is undisputed that petitioner has not met the requirements set forth in Section 2254(e)(2). As discussed above, petitioner's claim is not based on a new rule of constitutional law, and the facts petitioner seeks to include in the record were readily available to him at the state court proceedings. Moreover, the facts alleged regarding racial discrimination in jury selection have no bearing on his innocence or guilt regarding the underlying offense and thus do not establish that no reasonable factfinder would have found petitioner guilty of the underlying offense. The court therefore denies petitioner's request to expand the record to include his trial counsel's notes of the voir dire.[3]

Without the notes identifying the race of individual prospective and actual jurors, the court cannot engage in the comparative juror analysis that the Ninth Circuit intended. However, as discussed below, even if the court were to consider the contents of the notes to perform statistical analysis and comparative juror analysis, the court would still deny petitioner's *Batson* claim.

**B.     Standard of Review**

A court may grant a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). The court may grant

---

[3] Because the new evidence is barred under 28 U.S.C. § 2254(e)(2), the court need not address respondent's hearsay objection.

1  the writ only if the state court's ruling "resulted in a decision that was contrary to, or involved an
2  unreasonable application of, clearly established Federal law, as determined by the Supreme Court of
3  the United States" or was "based on an unreasonable determination of the facts in light of the
4  evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Ordinarily, the review of state court decisions in a habeas case is highly deferential. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2202).  However, in this case, the Ninth Circuit found that the California appellate courts' denial of petitioner's request for a free transcript of the entire voir dire was contrary to, or involved an unreasonable application of, clearly established federal law because without a complete voir dire transcript, the courts could not fully evaluate the relevant circumstances surrounding the contested peremptory challenge as required by *Batson*.  *See Boyd*, 467 F.3d at 1142.  This court thus reviews petitioner's *Batson* claim de novo.  *See Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000) ("where the state trial court uses the wrong legal standard, [the usual] rule of deference does not apply").

### C. Petitioner's *Batson* Claim

Petitioner contends that the prosecutor's struck prospective juror Ms. Brown, an African-American woman, due to her race and thus violated his rights under the Equal Protection Clause of the Fourteenth Amendment.  *Batson* set forth a three-step process for considering a claim of racial discrimination in the exercise of a peremptory challenge.  First, petitioner must establish "a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  *Batson*, 476 U.S. at 93-94.  If petitioner makes this showing, then the burden shifts to the prosecution to provide a race-neutral explanation for the peremptory challenge.  *Id.* at 97.  Finally, in step three, the trial court must determine whether petitioner has established purposeful discrimination.  *Id.* at 98.

In order to establish the prima facie case of purposeful discrimination called for in step one, petitioner must show that: (1) the prospective juror is a member of a cognizable racial group; (2) the prosecutor used a peremptory challenge to strike the juror; and (3) the totality of the circumstances raises an inference that the strike was motivated by race.  *Boyd*, 467 F.3d at 1143.  Here, the first two requirements have clearly been met.  Ms. Brown, the prospective juror, is African-American, a

cognizable racial group, and the prosecution used a peremptory challenge to remove her from the jury pool. The only issue in dispute is whether the totality of the circumstances raised an inference that the contested strike was racially motivated. This hurdle is not intended to be:

> so onerous that a defendant would have to persuade the judge . . . that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

*Johnson*, 545 U.S. 162, 170 (2005).

Petitioner argues that the following three facts suffice to raise an inference of discrimination: (1) an African-American juror was peremptorily struck; (2) there was no apparent reason other than race to strike Ms. Brown; and (3) after three peremptory challenges by the prosecution, only two of the four prospective African-American jurors remained in the venire. As discussed above, the first fact is a required element for a prima facie showing of discrimination, separate from the requirement that the totality of the circumstances raise an inference of discrimination. The court thus considers petitioner's remaining two factual bases for inferring race-based discrimination. In order to assess the second alleged fact (that there is no apparent reason other than race to strike Ms. Brown), comparative juror analysis is necessary. *See Boyd*, 467 F.3d at 1147-48. To evaluate the third fact, the court performs statistical analysis.

### 1. Statistical Analysis

To establish a prima facie case of purposeful discrimination, petitioner need not show that the prosecution has engaged in a pattern of discriminatory strikes against more than one prospective juror because the Constitution forbids striking even a single prospective juror for a discriminatory purpose. *Id.* at 1147. Nonetheless, it can be informative in some cases to consider the percentage of jurors of a particular race that are stricken by the prosecution. *See Miller-El v. Dretke*, 545 U.S. 231, 240-41 (2005) (noting that "[t]he numbers describing the prosecution's use of peremptories are remarkable"). An inference of discrimination can arise when the prosecutor strikes a high proportion of panel members from a racial group or uses a disproportionate number of strikes against members of a single racial group. *See Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir.

2002) (considering "not only the high proportion of African-Americans stricken, but also . . . the disproportionate rate of strikes against African-Americans").

In this case, the prosecutor used a peremptory challenge to strike one out of four African-American members of the jury pool. Dkt. No. 53 ("RT") at 151. Another African-American had been excused for cause based on nondisclosure of prior arrests. *Id.* Regardless of whether the percentage of peremptorily stricken African-Americans is calculated as one out of three (33%) or one out of four (25%), this is insufficient by itself to raise an inference of discrimination.[4] *See Cooperwood v. Cambra*, 245 F.3d 1042, 1048 (9th Cir. 2001) (finding that petitioner had failed to raise an inference of racial discrimination where the prosecutor used one out of three peremptory strikes against an African-American prospective juror and used the other two against white prospective jurors).

Without expanding the record to include petitioner's trial counsel's notes, there is insufficient information about the racial composition of the panel to determine whether the prosecutor used a disproportionate number of strikes against African-American prospective jurors. Moreover, even if the racial information in the notes were considered to allow further statistical analysis, the disparity in the resulting figures is insufficient to raise an inference of discrimination. The prosecutor in this case used a total of four peremptory challenges. *See* RT 137, 144, 150, 163. Only one of these peremptory challenges (25% of the total) was used to remove an African-American prospective juror. *See id.*; Dkt. No. 52 Ex. 2. The other three peremptory challenges (75% of the total) were used to strike white prospective jurors. *See* RT 137, 144, 163; Dkt. No. 52 Ex. 2. The jury panel contained 19 white members and four African-American members. *See* Dkt. No. 52 Ex.2. Setting aside members of the panel that were neither white nor African-American, African-American members made up approximately 17% of the panel, while white members made up approximately

---

[4] Contrary to petitioner's assertion, the Ninth Circuit did not find an inference of discrimination based on two out of four African-American prospective jurors being stricken in *United States v. Bishop*, 959 F.2d 820 (9th Cir. 1992). In *Bishop*, the prosecutor had already offered an explanation for the peremptory challenge, rendering the prima facie showing required by the first *Batson* step moot. *Id.* at 824. Hence, rather than considering whether the defendant had successfully raised an inference of discrimination, the Ninth Circuit simply evaluated the explanation offered by the prosecutor and found that it was not race-neutral. *Id.* at 824-25.

1  83% of the panel.  Although the percentage of peremptory strikes used against African-American
2  members (25%) does not perfectly match the percentage of African-American members in the jury
3  panel (17%), the disparity is not significant, particularly in light of the small numbers involved.  *See*
4  *Fernandez*, 286 F.3d at 1078 (noting that even if a prosecutor struck two out of two prospective
5  jurors of a particular race, this alone may be insufficient to support an inference of discrimination
6  because "the numbers are so small (and hence, potentially unreliable)").  The court concludes that
7  there is not a sufficiently disproportionate number of strikes against African-American members to
8  raise an inference of discrimination.

### 2. Comparative Juror Analysis

Comparative juror analysis refers to "an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group."  *Boyd*, 467 F.3d at 1145.  The Supreme Court has noted that such side-by-side comparisons of the stricken minority panelist with the non-minority panelists that were permitted to serve is "more powerful than . . . bare statistics" in determining whether an inference of discrimination may be drawn.  *Miller-El*, 545 U.S. at 241. Though comparative juror analysis has traditionally been associated with step three in a *Batson* analysis, the Ninth Circuit has held that courts should engage in comparative juror analysis when considering whether a defendant has made the prima facie showing of discrimination required at step one.  *See Boyd*, 467 F.3d at 1149 ("Without engaging in comparative juror analysis, we are unable to review meaningfully whether the trial court's ruling at either step one or step three of *Batson* was unreasonable in light of Supreme Court precedent.").

Because comparative juror analysis consists of comparing the prosecutor's treatment of Ms. Brown with his treatment of similarly situated jurors who were not African-American, the court cannot conduct this analysis without information about the race of individual prospective and actual jurors.  As noted above, petitioner failed to adequately develop the record regarding each juror's race during state court proceedings and is thus precluded from expanding the record at this time to include the new documentary evidence he needs for comparative juror analysis.  Moreover, even if the court were to expand the record to include petitioner's trial counsel's notes, making comparative

juror analysis possible, the court would still find that petitioner has failed to raise an inference of discrimination.

Petitioner does not contend that the prosecutor's questioning of African-American members of the jury panel was different from his questioning of panelists who were not African-American. Rather, petitioner asserts that Ms. Brown's responses to the voir dire questions were similar to those of other panelists who were not peremptorily struck, suggesting that the prosecutor's decision to strike her was based on race, not based on race-neutral factors. Having examined the voir dire transcript, the court disagrees. Ms. Brown's voir dire responses suggest at least two race-neutral reasons that may have caused the prosecutor to seek her removal: (1) her family relationships and (2) her work responsibilities.[5]

### a. Family Relationships

Ms. Brown had four daughters and seven grandchildren. RT 130, 134. Her voir dire responses indicated that she was actively involved in her grandchildren's lives. When asked how she liked to spend her free time, she responded, "I have seven grandkids," and stated that they kept her busy. RT 134. Her status as a grandmother is relevant because this case involves a grandmother calling the police on her grandson and providing key testimony against him at trial. Concern that a prospective juror could be hostile to the prosecutor's key witness is a race-neutral reason for striking that juror. The fact that Ms. Brown was a grandmother, standing alone, does not suggest that she would be hostile to the key witness. However, when asked whether she could imagine a situation where she would call the police on someone she loved, Ms. Brown answered, "Yes. Depends on the circumstances." RT 134. Although she answered in the affirmative, the fact that she then qualified her answer with "[d]epends on the circumstances" suggests that Ms. Brown may have had some qualms about calling the police on a loved one. The combination of her close relationship with her

---

[5] Petitioner argues that the court should not speculate as to possible reasons for the peremptory challenge. Petitioner is correct that, during step three of a *Batson* analysis, courts may only consider the stated reason for the strike given by the prosecution. *See Miller-El*, 545 U.S. at 252. However, at step one of the analysis, when petitioner seeks an inference of discrimination based on the alleged lack of any nonracial reason for the strike, courts are to assess this claim by considering whether there are possible nonracial reasons for the strike. *See Boyd*, 467 F.3d at 1147-48.

grandchildren and possible reservations regarding calling the police on her loved ones provide a race-neutral basis for striking her.

Based on the voir dire transcript, it appears that only one other prospective juror had grandchildren – alternate juror 2. RT 195. Since alternate juror 2 was an African-American female, her responses would not normally be considered for the purposes of comparative juror analysis. Dkt. No. 52 Ex. 2. Moreover, even if her responses were to be considered, unlike Ms. Brown, she stated that she would call the police on someone she loved if she had to "without hesitation." RT 195.

Petitioner argues that, when asked whether they would call the police on a loved one, jurors 1, 9, 11, and 12 gave qualified answers, much like Ms. Brown's, yet they were permitted to serve. Juror 1, a white male, stated that he would report a loved one to the police "[i]f I see personal damage to them physically or mentally, yes." RT 49; Dkt. No. 52 Ex. 2. Though he did qualify his affirmative answer, juror 1's response made clear where he drew the line and was not as ambiguous (and potentially risky for the prosecution) as "[d]epends on the circumstances." Juror 9, a white female, responded to the question, "Do you think that you can imagine a situation where you might have to call the police on someone you love?" by volunteering that she had done so before by calling the police on a neighbor. RT 148; Dkt. No. 52 Ex. 2. When she was then asked the follow-up question, "It could be farther than that if you had to?", she answered without qualification, "Correct." RT 148. Thus, her responses did not hint at any qualms regarding reporting loved ones to the police.

Jurors 11 and 12 did qualify their answers to the question whether they would call the police and turn in loved ones, though their responses were arguably less ambiguous than Ms. Brown's. Juror 11, a Hispanic female, stated that she could imagine a situation where she had to call the police on a loved one. RT 74; Dkt. No. 52 Ex. 2. When asked whether she would turn a loved one in to the police, she answered, "Yes. If it's necessary I will." RT 74. Similarly, when asked whether she could imagine a situation where she might have to call the police on someone she loved, juror 12, a white female, responded, "If need be, yes." RT 166; Dkt. No. 52 Ex. 2. Even if these responses are viewed as identical in content to Ms. Brown's response, jurors 11 and 12 were quite different from

1  Ms. Brown in terms of their family background. Unlike Ms. Brown, who had four children and
2  seven grandchildren, both juror 11 and juror 12 did not have any children (and thus no
3  grandchildren). RT 34, 165.
4  Unlike other prospective jurors, Ms. Brown had a close relationship to her grandchildren and
5  had also indicated possible reservations regarding her willingness to report a loved one to the police.
6  Her unique situation and its relevance to this case provide a race-neutral reason for striking her and
7  thus weigh against finding an inference of discrimination.

### b. Work Responsibilities

8  
9  Ms. Brown expressed concern that missing work for the length of the trial would be a
10 hardship for the communities that she served. RT 128. She worked as a coordinator for the Home
11 Energy Assistance Program, a non-profit organization, and held workshops teaching low-income
12 residents how to be energy efficient and assisting with paying utility bills. RT 128-29. The program
13 was reimbursed by the state of California based on the number of clients served, and the program in
14 turn compensated Ms. Brown based on the number of clients she served. RT 131-32. Although she
15 would only lose "a little bit" of income as a result of missing work to serve as a juror, Ms. Brown
16 stated that the cancellation of workshops would have a greater adverse impact on the low-income
17 residents she served than it would on her own income. *Id.*
18 Ms. Brown was the only coordinator serving the cities of Oakland and Alameda, and when
19 she was forced to cancel workshops, there was no one to replace her. RT 129-30. Although the trial
20 was only expected to last a few days, she had already been forced to cancel several days of
21 workshops due to jury duty, and this likely impacted many of her low-income clients since on
22 average, between 40 to 63 people appear for her workshops on a given day. RT 129, 132. When the
23 prosecutor asked her whether she would be distracted by missing work, Ms. Brown initially
24 answered, "Not really. I don't think so." RT 132. The prosecutor noted that her answer sounded
25 hesitant, and she qualified her statement, explaining that her absence "does have impact on the
26 community because it is a nonprofit organization, and the organization does depend on its funds."
27 *Id.* The concerns that Ms. Brown expressed about missing work and her hesitant response to the
28 question about whether she would be distracted by missing work suggest that she might be distracted

or hurried in her deliberations and thus provide a race-neutral reason for removing her from the jury.

Petitioner contends that jurors 9 and 11, who were permitted to serve, had similar work-related concerns. Juror 9, a white female, initially indicated some concern that if the trial went beyond a week, she was not sure if she would get paid for the additional missed time from work. RT 145; Dkt. No. 52 Ex. 2. She could not confirm whether she would be paid if the trial went beyond a week because her boss was on vacation. RT 145. However, she explained that this was unlikely to be a problem because her manager had assured her that she would be paid for the time she had missed the previous week for jury duty, and she believed she would be paid for the current week as well. RT 146-47. When juror 9 was informed that the case would likely be turned over to the jury for deliberation by Monday, she said that would be okay. RT 147. Moreover, when asked whether she would like to serve on the jury assuming the trial did not go past Friday, she responded, "No, it can go past Friday, but yeah, that's fine. I've never done it. This is my first time." RT 149. In short, juror 9's concern was limited to the slight possibility that she might lose some income if the trial went beyond a week, and it appears that this concern was assuaged during voir dire since she indicated a desire to serve on the jury even if the trial went past Friday.

Juror 11, a Hispanic female, had just begun a new position as an administrative assistant in the legal affairs department of Roche Bioscience three weeks ago. RT 73; Dkt. No. 52 Ex.2. She had previously worked as an administrative assistant in the accounting department of the same company. RT 74. Unlike Ms. Brown, she did not immediately express concern regarding the disruption that jury duty would have on her work responsibilities. To the contrary, Juror 11 expressed a desire to serve on the jury "[b]ecause I do think it's part of being a good citizen and could contribute and be fair with others." RT 90. When asked, "You think you personally, that you would be able to do that?", she responded, "I think so. Part of inconvenience also because I'm new at this job, but beside that, yes." RT 90. The fact that juror 11 did not initially bring up the length of the trial as a concern and only briefly mentioned that missing work would be inconvenient suggests that she was not particularly concerned by the inconvenience that serving on a jury entailed.

Jury duty is inconvenient to most, if not all, jurors since they must temporarily put their lives on hold to attend a trial. However, Ms. Brown's work-related concerns were unique. Unlike other

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY—No. C-00-21287 RMW
CCL                            14

prospective jurors, her absence, even for a short period of time, would adversely impact the low-income clients she served since there was no one available to replace her. The fact that these work-related concerns could pose a distraction or cause her to be hurried in her deliberations is another race-neutral basis for striking Ms. Brown.

The presence of two race-neutral, non-trivial distinctions between Ms. Brown and the non-African-American jurors that were permitted to serve cuts against petitioner's claim that similarly situated prospective jurors were treated differently based on race. Hence, even if this court were to consider the racial information in the voir dire notes, comparative juror analysis does not bolster petitioner's claim of race-based discrimination. Having found that the voir dire transcript reveals race-neutral bases for striking Ms. Brown, the court rejects petitioner's assertion that there was no apparent reason to strike her other than race. Petitioner is thus left relying solely on the fact that the prosecutor exercised a peremptory challenge to remove one out of four African-American prospective jurors.[6] This, by itself, is insufficient to raise an inference of discrimination. *See Boyd*, 467 F.3d at 1147 (finding the mere fact that the prosecutor had removed two out of four African-American members from the panel insufficient to establish a prima facie case of discrimination). Because petitioner has failed to establish a prima facie case of purposeful discrimination, the trial court did not err in ending the *Batson* inquiry with step one and not requiring the prosecutor to give any reason for his peremptory challenge. *See Batson*, 467 U.S. at 97. The court therefore denies petitioner habeas relief based on his *Batson* claim.

### III. CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. § 2254. For the reasons set out in the discussion above, petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right [or] that jurists of reason would find it

---

[6] Although this was the second African-American prospective juror struck by the prosecutor, the first one was struck for cause for failure to disclose prior arrests, and petitioner has not challenged the propriety of this earlier removal for cause. RT 151.

debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is denied.

### IV. ORDER

For the foregoing reasons, the petition for writ of habeas corpus is denied, and a certificate of appealability will not be issued.

DATED:     8/13/10

*Ronald M Whyte*
RONALD M. WHYTE
United States District Judge

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY—No. C-00-21287 RMW
CCL                                             16